Joseph T. Coyle v. Commissioner. Marguerite Coyle v. Commissioner.
Coyle v. Commissioner
Docket Nos. 19409, 19410.
United States Tax Court
1950 Tax Ct. Memo LEXIS 294; 9 T.C.M. (CCH) 64; T.C.M. (RIA) 50022; January 25, 1950
*294 George E. Flood, Esq., and C. L. Stone, C.P.A., for the petitioners. R. G. Harless, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion These proceedings, consolidated for hearing, involve deficiencies in petitioners' income taxes for 1943 and 1944, as follows: Docket
No.
Year
Deficiency
19409
1943
$1,512.02
1944
930.00
19410
1943
1,519.75
1944
930.00 The sole question in issue is whether distributions which the petitioner, Joseph T. Coyle, received from a corporation of which he was a stockholder in 1943 and 1944 constituted taxable income or whether they were payments on an indebtedness of the corporation. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners are husband and wife and are residents of Bremerton, Washington. They filed separate income tax returns for 1943 and 1944 with the collector of internal revenue for the district of Washington, in which they each reported one-half of their community income. The husband, Joseph T. Coyle, will be referred to hereinafter as the petitioner. Midnight Mining Company, Inc., was an Alaska corporation organized in *295 1940 for the purpose of operating certain gold mining leases. It operated for several months and filed a return for the period January 1, 1941, to July 31, 1941, in which it reported gross receipts from mining operations of $37,371.45. On August 2, 1941, the stockholders signed a consent to disolve the corporation and on the same date organized a new corporation known as Midnight Mines Developing and Operating Company, Inc. Midnight Mining Company, Inc., hereinafter sometimes referred to as the predecessor company, was dissolved on September 12, 1941, and its assets were distributed to its stockholders who assumed all of its liabilities. The stockholders of the predecessor company and of the Midnight Mines Developing and Operating Company, Inc., hereinafter sometimes referred to as the new company, and the number of shares held by each were as follows: Midnight Mines
Midnight
Developing
Mining
and Operat-
Stockholder
Co., Inc.
ing Co., Inc.
Joseph T. Coyle
1,000
200
James Coyle
500
200
Dennis Coyle
200
James O'Donnell
1,000
200
M. P. Halleran
500
100
W. J. Halleran
500
100
The authorized capital stock of the predecessor company *296 consisted of 5,000 common shares of a par value of $10 each. The successor company had authorized common stock of 1,000 shares, par value $10 each, and also 100 shares of preferred stock, par value $100 each, which were never issued. The assets of the predecessor company were all distributed to the stockholders upon dissolution. The net value of such assets and the outstanding liabilities, as shown in the balance sheet as of August 2, 1941, were as follows: Assets
Machinery and equip-
ment
$58,705.79
Development expense
10,500.39
Organization expense
5,205.22
Suspense account
7,063.96
Cash
13,464.69
Total assets
$94,940.05
Liabilities
Accounts payable (ma-
chinery and equip-
ment)
$25,961.65
Freight payable
1,699.71
Accrued wages
4,791.29
Accrued payroll taxes
293.49
Accrued interest
160.00
Accounts payable
4,610.20
Accrued royalties
2,952.26
Notes payable
7,500.00
Reserve for depreciation
17,086.62
Total liabilities
65,055.22
Net value of assets
$29,884.83
The adjusted book value of the machinery and equipment at the date of dissolution was $15,657.52, computed as follows: Cost
$58,705.79
Balance due (not to stockholders) on
purchase price
25,961.65
Equity of Midnight Mining Company,
Inc.
$32,744.14
Less: Reserve for depreciation
17,086.62
Adjusted book value
$15,657.52
*297 The incorporators of the new company held a meeting in Seattle, Washington, on August 2, 1941, at which they elected officers and directors and adopted bylaws. The minutes of that meeting read in part as follows: "The incorporators then discussed the matter of a contract between Dennis Coyle, James O'Donnell, Joseph T. Coyle, James Coyle, M. P. Halleran and W. J. Halleran, the owners of certain leases and licenses to mine property in and near Ruby, Alaska, and the contract was considered by the incorporators whereas and whereby the corporation should undertake mining operations covering the said leases and licenses, and after a discussion thereof the following resolution was adopted: "BE IT RESOLVED that the Midnight Mines Developing And Operating Company, Inc. enter into a contract with Dennis Coyle, James O'Donnell, Joseph T. Coyle, James Coyle, M. P. Halleran and W. J. Halleran for the development of the mining property according to the terms of the attached contract, and that said contract be made a part of the minutes of this meeting. Joseph T. Coyle announced that he represented Dennis Coyle, James O'Donnell and James Coyle as attorney in fact, and was authorized by said *298 parties to negotiate with the corporation with reference to the purchase of stock of the corporation, and that on behalf of himself and said Dennis Coyle, James O'Donnell and James Coyle he offered to subscribe for and pay for 800 shares of the common stock of said corporation by transferring to said corporation all of the interest of himself and Dennis Coyle, James O'Donnell and James Coyle in and to the machinery and equipment now on the mining property at Ruby, Alaska, the corporation to take such machinery and equipment subject to any and all outstanding indebtedness against said machinery and equipment. M. P. Halleran and W. J. Halleran joined in the offer of Joseph T. Coyle and offered to transfer all of their interest in the same for and in consideration of 200 shares of the capital stock of the corporation. Each of the said incorporators were familiar with the said machinery and equipment and the value thereof, and considered the fair value of said machinery and equipment and the value thereof, and considered the fair value of said machinery and equipment, subject to said indebtedness, was in excess of $10,000, and thereupon the following resolution was unanimously adopted: *299 "BE IT RESOLVED, By the incorporators of Midnight Mines Developing and Operating Company, Inc., that the subscription of Joseph T. Coyle, Dennis Coyle, James O'Donnell and James Coyle for 200 shares each of the stock of said corporation, and of M. P. Halleran and W. J. Halleran for 100 shares each, be accepted; and that the officers of said corporation, upon the transfer to the corporation of the machinery and equipment now on the mining property at Ruby, Alaska, subject to the indebtedness against said machinery and equipment, issue to said subscribers the following shares of common stock, fully paid and non-assessable: Joseph T. Coyle
200 shares
Dennis Coyle
200 shares
James O'Donnell
200 shares
James Coyle
200 shares
M. P. Halleran
100 shares
W. J. Halleran
100 shares"
Opening journal entries were made in the books of the operating company "to record subscription to all common stock" which show that the machinery and equipment were paid in for stock at its adjusted book value. There was an entry showing paidin surplus of $5,657.52, the difference between the adjusted book value of the machinery and equipment, $15,657.52, and the $10,000 of stock subscriptions. *300 There was also a footnote reading as follows: "To record the receipt of operating equipment and the assumption of contracts payable against the equipment. This pays the subscription account." Following its organization the new company continued the mining operations for the balance of the mining season, consisting of about one month, before closing down for the winter. It filed an income tax return for the fiscal year August 1, 1941, to April 30, 1942, in which it reported gross receipts of $40,449.54. A meeting of the stockholders of the new company was held on April 2, 1942, the minutes of which read in part as follows: "Mr. James Coyle further informed the stockholders of the urgent need of mining machinery and equipment, and called attention to the fact that an adequate supply of machinery and equipment, the property of the above named owners and cotenants, was now located on the premises and that said machinery was carried upon the books of the Midnight Mining Company, how dissolved, at the time of its dissolution on August 5, 1941, at its then worth and valuation of approximately $30,000 based upon its purchase price less depreciation, but stated to the stockholders that *301 in view of the present emergency and the difficulty, if not the absolute impossibility, of replacing it at any price, it was of a great deal higher value to the Midnight Mining and Development Company than the nominal valuation thus reported on the books of the dissolved corporation. The offer of the owners and cotenants to convey all right, title and interest in and to the said machinery, equipment and supplies and the physical property owned by them, and now located upon the said premises and leased property, for a consideration of $45,000, to be paid by crediting the said owners and cotenants with the amount of $10,000 in full payment of their stock subscription and the amount of $35,000 in the form of a note payable to each of them on or before a year from date, which note would be secured by a mortgage upon the machinery, equipment and physical property thus conveyed, was submitted to and discussed by the stockholders, and after a full discussion and consideration of the need for the machinery and supplies, of the value of the permission to mine the leased premises, and the tangible evidence of the presence of valuable gold ore in the said property, it was moved, seconded and *302 carried that the following resolution be adopted: "WHEREAS, James O'Donnell, James Coyle, Dennis Coyle, Joseph T. Coyle, William P. Halleran and Martin H. Halleran are the owners, as tenants in common, of the machinery, equipment and supplies now located upon the premises being mined by the Midnight Mining and Development Company in Alaska; and "WHEREAS, the said cotenants have permitted and authorized the Midnight Mining and Development Company to conduct mining operations on the said property; and "WHEREAS, by reason of mining operations heretofore conducted and preparatory and exploratory work already done, it is apparent that the said property contains valuable mineral ores; and "WHEREAS, it is impossible for the company at this time to procure or obtain mining machinery from any other source by reason of war conditions; Now, Therefore, "BE IT RESOLVED, that the officers of the Midnight Mining and Development Company be and they hereby are authorized to enter into and consummate contracts and agreements, and execute notes and mortgages necessary to effectuate the same, to purchase the said machinery, equipment and supplies from such owners and cotenants and to provide *303 for the payment thereof by extending to them a credit on the books of the Midnight Mining and Development Company of $10,000 in full payment of their stock subscription and to issue to them notes in the amount of $35,000, payable on or before the expiration of one year, to be secured by a mortgage upon the said machinery, equipment and supplies." Entries were made in the corporate books to reflect the action taken by the stockholders and the promissory notes referred to in the resolution were duly issued. The petitioner received a note dated April 17, 1942, for the face amount of $10,000, payable one year from date and bearing interest at the rate of 5 per cent. He later received distributions from the company purporting to be payments on the note of $7,000 in February 1943 and $3,000 in June 1944. These amounts were not reported as income in the returns filed by the petitioner and his wife for 1943 and 1944. The new company operated during the fiscal years ended April 30, 1942, and April 30, 1943, and filed income and declared value excess profits tax returns for those years. The 1942 return showed gross receipts of $40,449.54, a gross profit of $22,381.61, and a net operating *304 loss of $3,001.78. The 1943 return showed gross receipts of $68,597.71, a gross profit of $21,895.66 and a net income of $3,734.74. The officers of the new company were told in 1942 that oil and other essential operating supplies would not be available in 1943. It was then decided that operations would not be continued during the war period. Some of the equipment was sold to the Government in 1942 and some in 1943. Some of the assets were retained, however, and the company was finally dissolved July 12, 1946. No dividends were ever formally declared and no distributions denominated as dividends were ever made. Opinion LEMIRE, Judge: The respondent has determined that the distributions which the petitioner received from Midnight Mines Developing and Operating Company, Inc., of $7,000 in 1943 and $3,000 in 1944 were taxable dividend distributions, to the extent of the earnings and profits available for that purpose, and were not payments on the note which the company issued to the petitioner, allegedly in payment for assets transferred to the company at the time of its organization. Respondent thus determined that $5,459.58 of the $7,000 payment in 1943 and all of the $3,000 *305 payment in 1944 constituted taxable dividends. The petitioners do not contend, nor does the evidence show, that there were no corporate earnings available for dividends to the extent determined by the respondent. They concede in their brief that the amount of the $7,000 payment received in 1942 on which they are taxable, if any, is $5,459.58, as determined by the respondent. Our only question, therefore, is whether the note on which the payments to petition claimed to have been made represented a bona fide indebtedness of the company incurred in the acquisition of the equipment which petitioner and his associates transferred to it at the time of its organization. The records of the company plainly show that the equipment in question was all transferred to the company in exchange for stock at its adjusted book value. It is so stated in the minutes of the organization meeting held August 2, 1941, and in the opening journal entries made at that time. The petitioner's contention that the equipment then had a value greatly in excess of its adjusted book value, to wit, of approximately $70,000, against which the $35,000 of promissory notes were issued, is not supported by any evidence *306 except the petitioner's own opinion. The equipment might well have had that value in April 1942 when the corporate resolution authorizing the issuance of the notes was adopted and after our entry into the war. However that may be, the evidence is that the equipment was all acquired by the company in exchange for stock at the time of its organization. That being true, the individual stockholders no longer held any interest in it after the transfer. Whatever value it may have had in excess of stock subscriptions should properly have been shown as paid-in surplus. The company's books did, in fact, show a paid-in surplus attributable to the assets so acquired of $5,657.52. The evidence does not show that the amount did not represent the then value of the equipment in excess of the stock subscriptions. We must conclude on the evidence that the note on which the disputed payments to petitioner were said to have been made was not issued in exchange for assets or for any valid obligation of the issuing company, and that the payments to petitioner were in reality taxable distributions to the extent determined by the respondent. Petitioner makes the alternative argument that if any gain *307 was realized from the distributions in question it was in 1942 when he received the note and not in 1943 and 1944 when the note was paid. Our conclusion that the note itself was issued without consideration and was a nullity and that the alleged payments thereon were distributions either of taxable dividends or capital leaves no basis for that argument. Decision will be entered for the respondent.